**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

THELMA SOTO, Individually, as )
Representative of the Estate of Joshua W. )
Soto, deceased, and as Mother and Next )
Friend of Jayden Warren Soto, a minor, et al., )
                                     )
         Plaintiffs, )
                                       )         No. 15-cv-08410
         v. )
                                       )         Judge Andrea R. Wood
ISLAMIC REPUBLIC OF IRAN, et al., )
                                       )
         Defendants. )

**<u>MEMORANDUM OPINION AND ORDER</u>**

On June 16, 2009, Shia militants associated with the Iraqi insurgent group the Promised

Day Brigades ("PDB") detonated an explosively formed penetrator ("EFP") on the side of a road

in Iraq's Muthanna Province as a four-vehicle convoy of U.S. forces drove by. The explosion

impacted a vehicle whose passengers included Plaintiff Miles Murray and Joshua Soto. As a result

of the EFP attack, Soto was killed and Murray sustained serious physical and mental injuries. The

present case arises out of that EFP attack and was brought by Murray and Soto's widow, Plaintiff

Thelma Soto, individually, as representative of the Estate of Joshua W. Soto, and as mother and

next friend of Jayden Warren Soto, a minor. According to Plaintiffs, the PDB received material

support and resources from Defendant Islamic Republic of Iran ("Iran"), which provided that

support intending that the PDB attack American service members on its behalf. Plaintiffs

therefore seek to hold Iran civilly liable for Soto's death and Murray's injuries pursuant to the

Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.* After Iran was served and

failed to enter an appearance, this Court entered default against it. Plaintiffs subsequently filed a

motion for entry of default judgment. (Dkt. No. 64.) For the reasons that follow, Plaintiffs' motion is granted.

## BACKGROUND

Under the FSIA, "[n]o judgment by default shall be entered . . . against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). Consequently, on a motion for default judgment, the Court "may not simply accept a complaint's unsupported allegations as true." *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 319 (D.D.C. 2014) (internal quotation marks omitted). However, where the uncontroverted factual allegations are supported by admissible evidence, the Court can accept them as true. *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 31 (D.D.C. 2018). Thus, this Court held a four-day evidentiary hearing on Plaintiffs' motion for default judgment. As Iran did not appear, Plaintiffs' evidence was unchallenged.

At the hearing, Murray and Thelma testified as fact witnesses. The Court also heard testimony from the following: Valerie Murray, Murray's wife; Major Brandon Soltwisch, Murray and Soto's commanding officer; Chukwuemeka Atum, an independent consultant hired by the U.S. State Department to advise Iraqi police and a witness to the attack at issue here; and Lieutenant Colonel Jeremy Robinson, an officer with the Army's Judge Advocate General Corps who participated in and observed the Iraqi criminal proceedings surrounding the attack.

The Court also heard testimony from three expert witnesses. Dr. Matthew Levitt testified regarding Iran's role as a state sponsor of terrorism. Levitt is the Director of the Reinhard Program on Counterterrorism and Intelligence at the Washington Institute for Near East Policy. His relevant experience includes a stint as a counterterrorism intelligence analyst at the Federal

Bureau of Investigation, and he has worked as a senior official at the U.S. Treasury Department's terrorism and financial intelligence branch. In addition, Levitt has written extensively on Hezbollah and its activities. He has previously served as an expert on international terrorism in numerous federal court proceedings. The Court is satisfied that Levitt is qualified to testify as an expert in this case.

Donald Wade Barker, a retired Captain in the U.S. Army gave expert testimony on improvised explosive devices ("IEDs") and EFPs. During his time in the Army, Barker received training on explosive ordinance disposal, IEDs, and EFPs. While serving overseas, Barker commanded the Army's first Counter-Improvised Explosive Device unit. After his discharge from the Army, Barker worked as a research scientist assisting in the development of new counter-IED equipment, among other things. At the time of his testimony, Barker served as the Chief Executive Officer of a counter-terrorism consulting and research and development firm. The Court finds Barker qualified to testify as an expert on EFPs.

Finally, Dr. John Mundt testified as a damages expert with respect to Murray's psychological injuries from the attack. Mundt is a licensed clinical psychologist with expertise in combat trauma. He serves as an assistant professor of psychology at the University of Illinois Chicago and he is a staff psychologist at the Jesse Brown Veterans Administration Medical Center in Chicago. In connection with this case, Mundt performed a psychological evaluation of Murray. The Court finds Mundt qualified to provide expert testimony.

Based on the testimony and exhibits introduced during the evidentiary hearing, the Court makes the following findings of fact.

I.     **History of Iranian Involvement in Iraq**

At the evidentiary hearing, Plaintiffs' expert Levitt provided the Court with an overview of Iran's history of supporting and training terrorist groups throughout the Middle East. Based on Levitt's testimony, the Court finds as follows.

In 1979, the Iranian Revolution culminated in the overthrow of the Shah of Iran followed by the formation of the Islamic Republic of Iran and the ascent of Imam Ruhollah Khomeini to the position of the country's Supreme Leader. (Tr. at 323:4–6.)[1] Yet the revolution was not intended to end at Iran's borders, as the new regime sought to export the revolution to countries with either majority Shia populations or large minority Shia populations. (*Id.* at 323:7–14.) To support that effort, the Iranian Revolutionary Guard Corps ("IRGC") was established shortly after the new regime came to power. (*Id.* at 327:23–328:5.)

While Iran has a conventional military dedicated to defending the country's borders, the IRGC operates as a type of parallel military system dedicated to preserving and exporting the ideology of the 1979 revolution. (*Id.*) One component of the IRGC is the Quds Force, which is responsible for interfacing with Iran's various proxies in other countries. (*Id.* at 328:6–19.) Accordingly, the Quds Force is organized into multiple departments or units dedicated to specific areas, including Afghanistan, Iraq, the Gulf, and the Levant. (*Id.* at 328:14–19.) Department 9000, also known as the Ramazan Corps, is the Quds Force unit dedicated to Iraq. (*Id.* at 328:20–22.) The head of the Quds Force reports directly to the Supreme Leader. (*Id.* at 328:14–15.)

Iran first successfully exercised its influence in another country's affairs after Israel invaded Lebanon in 1982 in an effort to combat Palestinian groups that were shooting at Israeli communities from across the border. (*Id.* at 330:22–25.) For Iran, the Israeli invasion presented an

---

[1] The transcript from the evidentiary hearing can be found at Docket Numbers 80, 81, 82, and 87.

opportunity for it to unite disparate Lebanese Shia militant groups under Iranian control. (*Id.* at 330:25–331:4.) Thus, Iran sent about 1,500 IRGC advisors to provide ideological and military training to the Lebanese Shia. (*Id.*) Ultimately, Iran's efforts resulted in many Lebanese Shia militants uniting under the Hezbollah umbrella. (*Id.* at 331:8–21.) At Iran's behest, Hezbollah would carry out numerous attacks, primarily against Western targets including the U.S. Embassy in Lebanon and U.S. Marine barracks. (*Id.* at 331:8–332:3.)

Closer to home, Iran was interested in expanding its influence over its neighbor in Iraq. (*Id.* at 323:16–19.) Iraq's then-dictator, Saddam Hussein, viewed the new revolutionary Iranian government with suspicion, in part because he was a Sunni Muslim running a majority Shia state. (*Id.* at 323:20–25, 325:12–24.) Moreover, Hussein had a longstanding desire to bring new territories under his control and was particularly attracted to Iran's oil reserves. (*Id.*) For those reasons, Hussein invaded Iran in 1980, which led to a prolonged, eight-year war between the two countries. (*Id.* at 324:1–9.) The Iran-Iraq War was devastating for both sides and left Iran viewing Iraq as the greatest threat to its existence. (*Id.* at 324:12–14.) Thus, after the war ended, Iran began pursuing a similar strategy in Iraq as that it used in Lebanon. (*Id.* 324:16–25.) Specifically, Iran worked through proxies to court, fund, train, and arm a variety of Iraqi Shia militant groups to carry out attacks against Iraq on Iran's behalf. (*Id.*) Sometimes, these Iraqi Shia militant groups would partner with Lebanese Hezbollah to carry out attacks in Iraq and other Gulf states. (*Id.* at 325:1–4.) Some Iraqi Shia militants were effectively incorporated into the Quds Force and some were given Iranian citizenship. (*Id.* at 333:12–16.)

Until 2003, Iran's goal in Iraq was to destabilize the country and undermine the Hussein regime, thereby minimizing Iraq's threat to Iran. (*Id.* at 325:12–24.) However, when the U.S. invaded Iraq and ousted the Hussein regime in 2003, it also took down the greatest threat to Iran.

(*Id.* at 332:10–19.) At the same time, Iran perceived a new threat from the fact that it neighbored not just the invasion of Iraq led by the United States but also the U.S.-led invasion of Afghanistan, Iran's neighbor to the East. (*Id.* at 332:15–25.) Indeed, the United States had previously referred to Iran as a major state sponsor of terror and the country had been cited as a part of the "Axis of Evil" by the administration President George W. Bush. (*Id.* at 332:20–333:7.) Thus, Iran feared that the United States would invade it next. (*Id.*)

To stave off the new threat to its security, Iran began to expand its network in Iraq and invested in numerous Iraqi Shia organizations and even some non-Shia organizations following the fall of the Hussein regime. (*Id.* at 333:17–25.) Iran sought to cast a wide net so that it would have relationships with and influence over whichever groups became ascendent in the new Iraq. (*Id.* at 333:17–334:5.) It also had to walk a tightrope to ensure that Iraq was unstable enough not to present a security threat but not too unstable, as neighboring a weak state under constant attack would present a different security threat to Iran. (*Id.* at 334:22–335:9.) Iran ultimately wanted to see Iraq become a Shia-dominant and Shia-governed state. (*Id.* at 334:6–11, 335:2–9.) In such a circumstance, Iraq presented an opportunity to Iran, as it could go from being Iran's single biggest adversary to potentially its strongest ally. (*Id.* at 335:2–9.)

To achieve its aims in Iraq, Iran needed to push the U.S. coalition forces out of Iraq. (*Id.* at 335:16–20.) Further, in doing so, Iran sought to give the United States a "bloody nose" and humiliate it so as to make the United States reluctant to invade another Muslim country in the future. (*Id.* at 335:16–336:1.) However, Iran knew that it would not succeed in a direct confrontation between its conventional military forces and the United States. (*Id.* at 336:2–9.) Rather, its best strategy would be "to engage in asymmetric conflict, gray zone warfare" using the proxies it had nurtured in Iraq. (*Id.*) Such a strategy entailed less risk, was less expensive, and

afforded Iran "reasonable deniability" as to its involvement in attacks on U.S. personnel. (*Id.*) Evidence of Iran's strategy in Iraq was obtained by the United States after it captured a number of senior Quds Force and IRGC officials and Hezbollah operatives. (*Id.* at 340:3–23.)

By the time of the United States's invasion of Iraq, Hezbollah had become a "first among equals within the panoply of proxy groups run by Iran." (*Id.* at 336:11–17.) Although Hezbollah was, at the time, a Lebanese entity, it also accepted the "rule of the jurisprudent." (*Id.*) The concept is rooted in the hierarchical nature of Shia Islam and was one of the "innovations" of the 1979 revolution. (*Id.* at 326:19–327:9.) According to the rule of the jurisprudent, the Supreme Leader of Iran was to be an Iranian cleric who would serve as the mouth of God on earth. (*Id.*) Thus, for Hezbollah, when Iran's Supreme Leader made a request of it, there was no question that it would obey. (*Id.* at 336:11–17.) For that reason, when Iran turned to Hezbollah for assistance in Iraq, Hezbollah created a dedicated unit, Unit 3800, which would train Iraqi-Shia militant groups to attack U.S. coalition forces in Iraq. (*Id.* at 337:1–7.) Iran often played the various militant groups against each other in an effort to ensure that no group would become too powerful, thereby ensuring all would be beholden to Iran. (*Id.* at 338: 5–13.)

One militant group with which Hezbollah developed close ties was Jayesh al-Mahdi or the Mahdi Army ("JAM"). (*Id.* at 341:2–9.) JAM was the military arm of a political organization led by Shia cleric Moqtada al-Sadr. (*Id.*) Around 2005–2006, Iran began encouraging Sadr to disband JAM and involve himself in Iraqi politics. (*Id.* at 341:10–18.) Consequently, hardline JAM militants began to splinter into what the United States described as "special groups"—meaning Iranian proxies in Iraq that Iran tasked with attacking the Iraqi government, the Iraqi military, and U.S.-led coalition forces. (*Id.* at 341:19–342:9.) Among those groups splintering from JAM was the PDB, which was regarded by some as JAM's successor. (*Id.* at 342:12–19.) Iran has provided

hundreds of millions of dollars in support for the PDB and has supplied it with weapons. (*Id.* at 342:24–343:1; *see also* Pl.'s Ex. 30.) The PDB became particularly active around May 2009, specializing in using indirect fire and EFPs to attack U.S.-led forces in Iraq. (Tr. at 344:16–18, 345:2–4.)

## II.    EFPs

EFPs were one of the key weapons used by the PDB to attack U.S.-led forces. At the evidentiary hearing, Plaintiffs presented expert testimony from Barker about the design and construction of EFPs. In addition, Levitt offered expert testimony concerning Iran's development of EFPs and provision of them to its proxies abroad. This evidence was uncontroverted. Accordingly, based on Levitt's and Barker's testimony, the Court finds as follows.

An EFP is a sophisticated, high-energy explosive device designed to defeat armor. (Tr. at 185:11–24; Barker Expert Report at 8, Dkt. No. 76.) It uses a "specially designed main charge configuration incorporating an explosive charge with a concave metal liner, which by the force of the charge reshapes the plate into a high velocity metal slug capable of penetrating armor." (Barker Expert Report at 8 & n.4.) To defeat armor, the EFP focuses the energy of an explosive blast behind its metal liner such that, once detonated, the explosion creates enormous pressure that accelerates the liner and simultaneously reshapes it into a rod, slug, or other shape. (*Id.* at 9.) As a result, the projectile hits its target at a tremendous speed and sufficient mechanical power to penetrate even the most sophisticated armor. (*Id.*) EFPs used in Iraq were usually "made with a precision manufactured concave copper disk liner and a [high-energy] explosive, such as C-4, packed behind the liner." (*Id.* (footnotes omitted).) Upon detonation, the EFP creates an explosive wave that strikes the copper disk liner and transforms it into a "tadpole-shaped slug" that travels

at speeds of up to 5,000 meters per second. (*Id.* at 9–10.) At that speed, the resulting projectile is able to pierce through several inches of military-grade armor. (*Id.* at 10.)

Unlike conventional IEDs, EFPs are able to penetrate the up-armored High Mobility Multipurpose Wheeled Vehicles ("Humvees") used by U.S. forces in Iraq.[2] (Tr. at 191:8–20.) When an IED strikes one of those vehicles, the steel armor begins to bend and absorb the energy. (*Id.* at 187:9–22, 191:11–20.) By contrast, an EFP moves with so much speed and energy that the steel cannot even react; the projectile penetrates through the steel and destroys what is inside the vehicle. (*Id.*) People inside vehicles hit by an EFP will die and lose limbs—"[t]here are no minor injuries in an EFP attack." (*Id.* at 194:5–8.) By contrast, the Humvees' armor provides substantial protection to its occupants against conventional IED attacks. (*Id.* at 191:16–20.)

Also differentiating EFPs from conventional IEDs is the sophisticated nature of the device. A typical IED "can be any type of literally improvised homemade explosive." (*Id.* at 348:15–23.) On the other hand, an EFP cannot be easily produced by just anyone. (*Id.* at 317:18–20, 348:15–23.) Manufacturing EFPs requires specific engineering equipment and access to the proper resources, such as copper. (*Id.* at 188:20–25, 317:18–20, 348:15–349:1.) Further, effectively deploying EFPs requires substantial training. (*Id.* at 194:13–195:2, 319:4–10, 348:24–349:1.) Given the sophistication of EFPs, no Iraqi insurgent group could have manufactured or deployed the devices without outside assistance. (*Id.* at 189:1–13.)

The consensus of U.S. government officials is that the EFPs used in Iraq were produced in Iran by Iranians and then smuggled into Iraq. (*Id.* at 317:20–25, 318:15–24.) Then, Lebanese Hezbollah operatives trained Iraqi Shia militants how to deploy the devices. (*Id.*) Hezbollah had perfected the deployment of EFPs during the July 2006 Lebanon War when it used them against

---

[2] The Humvees use rolled homogeneous armor, a proprietary type of steel that is extremely hard, dense, and heavy. (Tr. at 191:8–15.)

the Israeli military. (*Id.* at 318:1–8.) There are several reasons for the near unanimity among U.S. government officials surrounding these conclusions. Most importantly, there was ample human intelligence from the capture of detainees tying Iran to the EFPs used in Iraq. (*Id.* at 357:4–10.) Moreover, no other country could have supplied the EFPs because U.S. and Iraqi government forces controlled all ports of entry and the Iraq-Iran border was the only border that was not completely sealed. (*Id.* at 351:16–23.) And no other country with the capability of manufacturing EFPs had any interest or involvement in Iraq at the times relevant here. (*Id.* at 351:6–12.) Iran was the only realistic partner for the Iraqi Shia militants given the sectarian conflicts between the Iraqi Shia and the country's Sunni Muslims and the fact that, besides Iran, the other countries bordering Iraq were also predominantly Sunni. (*Id.* at 354:5–355:2.) Iran was also the only government mass-producing EFPs. (*Id.*) Finally, there was no real secondary market for EFPs, as Iran tightly controlled access to the devices and any group who wanted them had to first earn Iran's trust. (*Id.* at 352:13–24.) Only the militant groups that worked most closely with Iran received access to EFPs. (*Id.* at 356:18–22.) The PDB was one of those trusted groups. (*Id.*)

### III. The June 16, 2009 Attack

On June 16, 2009, U.S. forces, travelling in a convoy of four up-armored Humvees, began a scheduled movement from the Eastern Barracks outside of Samawah in Iraq's Muthanna province to the Rumaitha District police headquarters. (Tr. at 22:8–17, 41:20–25, 42:23–43:4, 48:6–18, 50:24–51:3, 52:11–17; Pl.'s Ex. 56.) First Lieutenant Miles Murray and Sergeant Joshua Soto were in the second vehicle. (Tr. at 51:4–9.) Murray was the leader of the 3rd Platoon of Delta Company, 1st Battalion, 77th Armor Regiment, part of the 4th Brigade, 1st Armor Division, and Soto was a non-commissioned officer in the 3rd Platoon. (*Id.* at 22:8–9; 45:4–7; 95:15–96:22.) At the front of the convoy was an Iraqi police escort vehicle. (*Id.* at 52:12–17.)

As the convoy approached an underpass, the Iraqi police escort accelerated and drove off. (*Id.* at 53:4–54:3.) The second Humvee had just emerged on the other side of the underpass when there was a loud explosion from the direction of a telephone pole on the right-hand side of the road. (*Id.* at 54:4–19.) Murray testified at the evidentiary hearing that he heard a sound that he compared to standing too close to a loudspeaker at a rock concert but amplified by a thousand. (*Id.* at 103:7–24.) He also recalled experiencing an extremely hot and extremely painful sensation and then losing consciousness for about 15 to 30 seconds. (*Id.*) Meanwhile, troops inside the first Humvee observed men fleeing from the site of the detonation. (*Id.* at 57:1–25.) Believing those men to be responsible for the attack, the troops opened fire, wounding one of them. (*Id.*)

When Murray regained consciousness, he observed that the explosion blew him out of his seat even though he had been wearing a seatbelt. (*Id.* at 103:15–104:3.) Once Murray was assured that he had not been mortally wounded, he began tending to the Humvee's other occupants. (*Id.* 104:7–15.) He observed Soto holding his right hip and yelling from severe pain. (*Id.* at 104:16–22.) While Murray tried to provide first aid to Soto, he quickly realized that Soto's wounds were too severe for him to handle. (*Id.* at 104:23–105:3.) Thus, Murray got on the radio and called for a medical evacuation, describing Soto's wounds as urgent surgical—*i.e.*, injuries so severe that the person will die if not operated on quickly. (*Id.* at 58:11–25, 104:23–105:3.) Having lost sight of the attackers, the commanding officer in the first Humvee had the convoy return to base so that Soto could receive treatment. (*Id.* at 60:5–24.)

The entire convoy returned to the Eastern Barracks in the Humvees. (*Id.* at 59:5–60:7, 105:13–17.) Murray described "limping" the burning second Humvee two miles back to the Eastern Barracks. (*Id.* at 105:13–17.) During that trip, Miles was not fully aware of the severity of his injuries; he simply recalled losing a majority of the feeling in his legs and lower extremities.

(*Id.* at 105:19–25.) Upon the convoy's return to base, Soto was rushed to an aid station where EMTs tried to stabilize him while they awaited a medical evacuation helicopter. (*Id.* at 60:15–61:10.) Soto was put on a table and his uniform was cut off, revealing a large puncture wound in his right hip area, burnt flesh, and substantial bleeding. (*Id.* at 61:22–62:21.) Eventually, Soto was put on a medical evacuation helicopter for treatment at a combat support hospital, but he died of his wounds en route and was officially pronounced dead on his arrival at the hospital. (*Id.* at 62:21–63:11.)

Back at base, Murray began feeling significant pain and bruising in his upper body. (*Id.* at 106:17–21.) Soon, he observed blood in his urine. (*Id.* at 106:22–107:1.) About 24 hours after the explosion, Murray was medically evacuated to a hospital where he spent two weeks. (*Id.* at 107:21–108:2.) He was able to complete his deployment but did so in a limited capacity. (*Id.* at 107:17–20.) Although Murray was not injured in an immediately perceptible way (*i.e.*, he was not burned, did not lose a limb, and did not have shrapnel injuries), he felt during the remainder of his deployment that there was something "majorly wrong." (*Id.* at 107:13–16.) Near the end of his deployment, he began suffering from back pain, which has progressively worsened over time. (*Id.* at 110:12–16, 118:1–9.) Later, Murray was diagnosed with traumatic brain injury. (*Id.* at 112:13–19.) In addition, imaging revealed deterioration in the condition of Murray's spine. (*Id.* at 110:17–21.)

An investigation of the second Humvee revealed that the exterior of the vehicle had sustained substantial damage. (*Id.* at 67:23–68:4.) There was one golf-ball-sized hole that completely penetrated the vehicle's armor, leading to where Soto's hip was. (*Id.* at 68:20–69:10.) Shrapnel was lodged throughout the vehicle's interior. (*Id.* at 68:5–8.) In Soto's seat, blood and burn marks were observed. (*Id.* at 69:8–10.) Notably, copper residue was plainly visible on the

outside of the vehicle, a clear indication that the damage was caused by an EFP. (*Id.* at 69:11–71:2, 196:8–15, 197:6–198:1, 218:1–19.) Barker, the EFP expert, testified that the copper residue was conclusive evidence that an EFP was used. (*Id.* at 197:23–198:1, 205:21–23.) Normally, copper is ineffective in weapons because it is soft. (*Id.* at 197:23–198:1) But copper is effectively weaponized when used in an EFP because the initial explosion causes the copper to form into the proper teardrop shape that can be propelled at high speeds, thereby allowing the resulting slug to penetrate armor. (*Id.* at 190:3–191:3.) Thus, Barker concluded with a "high degree of certainty" that the Humvee was attacked with an EFP. (Barker Expert Report at 31; *see also* Tr. at 205:11–14.) Similarly, the U.S. government's official conclusion was that the attack involved an EFP. (Tr. at 451:17–22.)

### IV.   Post-Attack Investigation and Trials

The Iraqi police conducted an investigation of the June 16, 2009 attack and ultimately arrested, interrogated, and tried several suspects in Iraqi criminal court. (*Id.* at 82:20–83:16, 217:15–20.) In the leadup to the attacks, there was already intelligence indicating that the PDB had cells operating in the Muthanna province with plans to attacking U.S. forces in the area. (*Id.* at 212:2–14.) A preliminary investigation by the Iraqi Security Forces found that someone inside the Iraqi police escort had provided details about the convoy's movements on June 16, 2009 to members of the PDB. (*Id.* at 80:6–21.) In addition, Iraqi police quickly concluded that the attack involved an EFP and was perpetrated by the PDB. (*Id.* at 83:2–16.)

Following the attack, one suspect was arrested by Iraqi police the same day. (*Id.* at 452:9–14.) Two additional suspects were detained shortly thereafter. (*Id.* at 452:15–20.) Two of the suspects admitted to Iraqi police interrogators that they were involved in the attack and further admitted to being members of the PDB. (*Id.* at 81:5–12.) Around September 2009, a fourth

suspect was arrested. (*Id.* at 452:21–23.) Two separate trials were held for the four suspects in late 2009 —three were tried in one proceeding the fourth tried in the second. (Tr. at 452:9–23, Pl.'s Ex. 59.) At the evidentiary hearing in this case, the Court heard from Robinson, who participated in and observed the Iraqi criminal proceedings as a U.S. representative. (Tr. at 417:14–17, 419:4–19.) He testified that, by the time of the trial, he had full confidence in the Iraq's legal system and its ability to conduct a fair trial for the suspected attackers. (*Id.* at 449:1–16.)

During the pre-trial investigation, the first three suspects confessed to setting up an EFP to attack the convoy and those confessions were introduced during their trial. (*Id.* at 453:14–22, 454:16–455:7.) Moreover, members of the convoy were able to identify the suspects in a photographic lineup. (*Id.* at 454:1–5.) All three of the suspects were convicted for their roles in the attack. (*Id.* at 459:1–6.) The fourth suspect also confessed, claiming to have been the triggerman and acting as a member of the PDB. (*Id.* at 456:1–20, 458:1–10.) That confession led to the suspect being charged with being a part of a terrorist organization, specifically the PDB, and would later be admitted at his trial.[3] (*Id.* at 457:14–20, 458:1–10.)

## V.    Procedural History

Plaintiffs' First Amended Complaint (Dkt. No. 38) brings tort claims against Iran[4] pursuant to the FSIA's terrorism exception, 28 U.S.C. § 1605A. Plaintiff Murray brought the

---

[3] Most of the details regarding the investigation and trial of the suspected attackers were provided by Robinson. However, Robinson left the country in the middle of the fourth suspect's trial and was unable to testify to the result of that trial. (Tr. at 458:11–459:6.) Instead, he testified being advised in November 2010 that the suspect "was facing an interlocutory appeal" but the United States was confident that he would ultimately be convicted. (*Id.*)

[4] The FAC also named Ayatollah Ali Hosseini Khamenei and Ali Younesi as Defendants but those Defendants were voluntarily dismissed without prejudice. (Dkt. No. 54.) In addition, Plaintiffs claim that while Defendant Iranian Ministry of Information and Security is a proper party, it is also an unnecessary and duplicative party and therefore can be voluntarily dismissed without prejudice. (Pls.' Proposed Findings of Fact and Conclusions of Law at 2 n.1, Dkt. No. 92.) Plaintiffs represented that they had filed a motion to that effect but no such motion has been filed. Nonetheless, the Court construes Plaintiffs'

action on behalf of himself while Soto's wife, Plaintiff Thelma Soto ("Thelma"), asserts claims on her own behalf, as a representative of Soto's estate, and as mother and next friend of minor Jayden Warren Soto ("Jayden"), Soto's son. On February 5, 2020, this Court granted Plaintiffs' motion for entry of default pursuant to Federal Rule of Civil Procedure 55(a). (Dkt. No. 54.) Plaintiffs now seek entry of default judgment pursuant to Rule 55(b)(2). (Dkt. No. 64.)

## DISCUSSION

The FSIA "provides the sole legal means by which a plaintiff may bring a suit against a foreign state." *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 17 (D.D.C. 2016). "As a law that codifies sovereign immunity with limited exceptions, the FSIA envisions a process for litigating against foreign powers that respects the independence and dignity of every foreign state as a matter of international law while also providing a forum for legitimate grievances." *Murphy v. Islamic Republic of Iran* (*Murphy II*), 778 F. Supp. 2d 70, 71 (D.D.C. 2011). Therefore, the FSIA erects several procedural hurdles for plaintiffs suing foreign states to prevent courts from harming foreign interests or U.S. foreign relations "by acting hastily or failing to provide the foreign parties an adequate opportunity to respond." *Id.* One of those obstacles is the FSIA's requirement that no entry of default judgment may be entered "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see also Murphy II*, 778 F. Supp. 2d at 71–72.

Having heard evidence in support of Plaintiffs' claims, the Court turns to address whether default judgment should be entered. Default judgment may be entered in a FSIA case where: "(1) the Court has subject[-]matter jurisdiction over the claims, (2) personal jurisdiction is properly exercised over the defendants, (3) the plaintiffs have presented satisfactory evidence to establish

representation as a request for voluntary dismissal pursuant to Federal Rule of Civil Procedure 41(a)(2) and the Iranian Ministry of Information and Security is dismissed without prejudice.

their claims against the defendants, and (4) the plaintiffs have satisfactorily proven that they are entitled to the monetary damages they seek." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 75 (D.D.C. 2017).

## I. Subject-Matter Jurisdiction

Under 28 U.S.C. § 1330, a federal district court "shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state . . . for relief in personam with respect to which the foreign state is not entitled to immunity." The FSIA generally immunizes foreign governments from being sued in the United States unless an exception applies. *Braun*, 228 F. Supp. 3d at 75. Here, Plaintiffs have invoked jurisdiction under the FSIA's terrorism exception, which provides:

> A foreign state shall not be immune from jurisdiction of courts of the United States . . . in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). Further, there is no subject-matter jurisdiction under the exception unless Plaintiffs prove: (1) "the foreign state was designated as a state sponsor of terrorism at the time the act . . . occurred," *id.* § 1605A(a)(2)(A)(i)(I); (2) it remained so designated at the time the claim was filed, *id.*; and (3) at the time of the act, the claimant or victim was a U.S. national, member of the armed forces, or otherwise an employee or contractor of the U.S. government and acting within the scope of employment, *id.* § 1605A(a)(2)(A)(ii).

To begin, Plaintiffs have satisfied the relevant requirements of § 1605A(a)(2)(A). The U.S. State Department first designated Iran as a state sponsor of terrorism on January 19, 1984, and Iran has remained so designated since that time. (Tr. 320:4–322:9; Pl.'s Ex. 1.) And the

victims of the attack, Soto and Murray, were indisputably members of the armed forces. Next, there is no question that Plaintiffs are seeking money damages against a foreign state, Iran, for Murray's personal injuries and Soto's death. Thus, the key question is whether the death and injuries were caused by an "extrajudicial killing" and, if so, whether any Iranian officials, employees, or agents provided material support or resources for the extrajudicial killing while acting within the scope of their office, employment or agency.

For purposes of the FSIA, an "extrajudicial killing" is defined as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized people," excluding "any such killing that, under international law, is lawfully carried out under the authority of a foreign nation." 28 U.S.C. § 1605A(h)(7) (incorporating by reference the definition set out in the Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1992)). Further, courts have recognized that this definition of extrajudicial killing extends to attempted extrajudicial killings. *E.g.*, *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017) ("This Court is persuaded . . . that the Torture Victim Protection Act's definition of extrajudicial killing allows plaintiffs to assert liability for a defendant's attempted extrajudicial killing, even if no one died as a result of that attempt."); *see also Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017) (finding that a plaintiff can bring a claim under the FSIA's terrorism exception where the extrajudicial killing resulted in casualties, even if the plaintiff survived).

The Court finds that Murray and Soto were victims of an extrajudicial killing under this definition. Indeed, the evidence heard by the Court establishes that the perpetrators of the attack targeted the Humvee with an EFP, and that EFPs were designed to pierce the armor of the Humvees and kill the occupants inside. Soto was killed as a result of the attack and Murray was

injured. And given that the perpetrators of the attack were criminally charged and tried in an Iraqi criminal court, there is little question that the attack was not authorized by the Iraqi government and was not otherwise lawful.

Finally, Plaintiffs' evidence establishes that Iran provided material support and resources for the extrajudicial killing. Under the FSIA, "material support or resources" is defined to mean "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . , and transportation, except medicine or religious materials." 28 U.S.C. 1605A(h)(3) (incorporating by reference the definition at 18 U.S.C. § 2339A(b)(1)). For the terrorism exception to apply, the injuries and death at issue must have been "caused by" Iran's provision of material support and resources for the extrajudicial killing. *See Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 204 (D.D.C. 2017). The FSIA's "caused by" requirement is satisfied by a showing of proximate cause. *Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 177 (D.D.C. 2016). That requires a plaintiff to demonstrate that there was "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Id.* (internal quotation marks omitted).

As found above, the attack was perpetrated by the PDB at Iran's behest. Iran, acting through Hezbollah, the IRGC, and the Quds Force, provided training and millions of dollars of support for the PDB, and supplied it with weapons, including EFPs. *See, e.g.*, *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 55 (D.D.C. 2019) ("[M]aterial support or resources for prohibited actions that are provided through the Q[u]ds Force . . . satisfy the requirements of Section 1605A(a)(1)."); *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 85 (D.D.C. 2018)

("Iran's Quds Force was responsible for cultivating proxies in other countries and did so with Lebanese Hezbollah and [a network of Iraqi Shia militias responsible for the conduct at issue]. The Quds Force is part of the IRGC, which is, in turn, an arm of . . . Iran. Those findings are sufficient to satisfy the scope of office requirement." (citation omitted)); *Murphy v. Islamic Republic of Iran* (*Murphy I*), 740 F. Supp. 2d 51, 71 (D.D.C. 2010) ("Iran and [the Iranian Ministry of Information and Security], through their officials and employees, provided financial support and technical expertise to Hezbollah, which, acting at the behest and under the operational control of defendants, was an agent of defendants.").

Further, Plaintiffs' evidence establishes a reasonable connection between Iran's support for the PDB and the attack that killed Soto and injured Murray. Without the unique, armor-piercing capabilities of the EFP, it is highly unlikely that the PDB could have penetrated the Humvee's armor and cause the magnitude of harm suffered by Soto and Murray. And the evidence establishes that the PDB would not have had access to an EFP without Iran's support. Moreover, Iran's material support and resources for Iraqi Shia militants like the PDB significantly enhanced their ability to organize and carry out deadly attacks such as the one here. Finally, Iran could have reasonably foreseen that its support for the PDB and other Iraqi Shia militants' attacks on U.S. forces would result in personal injury and death to servicemembers like Soto and Murray. *See Fritz*, 320 F. Supp. 3d at 85 (holding that the torture and death of U.S. soldiers was a reasonably foreseeable consequence of Iran's provision of material support or resources to Iraqi militia group).

In sum, the Court concludes that Plaintiffs' claims are asserted against Iran, a foreign state and designated state sponsor of terrorism, for personal injuries and a death sustained by members of the U.S. armed forces, Soto and Murray. Further, Soto's death and Murray's personal injury

were both caused by Iran's provision, by way of its officials, employees, and agents acting in the scope of their office, employment, or agency, of material support and resources for the June 16, 2009 attack, an extrajudicial killing. Consequently, this Court has subject-matter jurisdiction under the FSIA's terrorism exception.

## II.     Personal Jurisdiction

The FSIA also requires that this Court establish that it has personal jurisdiction over Iran. "In cases involving default judgment under the FSIA, personal jurisdiction exists if effective service of process has been made." *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 209 (D.D.C. 2012). The FSIA provides that a foreign state or political subdivision of a foreign state may be served:

> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

> (3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned[;] or

> (4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a). These four methods of service are listed in order of preference, and "[w]hen a method of service is unavailable or unsuccessful, a plaintiff may attempt the next method available." *Bluth*, 203 F. Supp. 3d at 18.

Plaintiffs filed the operative First Amended Complaint on October 31, 2018. Because Plaintiffs had no special arrangement for service with Iran and there is no applicable international convention for service with Iran, options (1) and (2) were unavailable to Plaintiffs. *Id.* On December 10, 2018, the Clerk of Court sent the service package to all Defendants pursuant to § 1608(a)(3). (Dkt. No. 40.) After receiving no return receipts for the mailing, the Clerk of Court proceeded to issue alias summons and, on June 6, 2019, sent the service documents to the U.S. State Department. The U.S. State Department confirmed in a letter dated October 24, 2019 that Iran was properly served under § 1608(a)(4) on September 23, 2019, and enclosed certified copies of the diplomatic notes. (Dkt. No. 48.) In entering default on February 5, 2020, this Court concluded that Iran was served in accordance with § 1608. Because Iran was properly served, the Court finds that personal jurisdiction exists.

### III. Liability

Along with creating an exception to a foreign state's sovereign immunity, the FSIA's terrorism exception also creates a private right of action. In particular, 28 U.S.C. § 1605A(c) provides that a foreign state shall be liable for personal injury or death caused by the acts described in § 1605A(a)(1). The private right of action created by § 1605A(c) is available to Murray, as a member of the armed forces. 28 U.S.C. § 1605A(c)(2). It is also available to Thelma in her individual capacity, as a U.S. citizen, (Pls.' Suppl. to Proposed Findings of Fact and Conclusions of Law, Dkt. No. 96); 28 U.S.C. § 1605A(c)(1), as representative of minor Jayden, a U.S. citizen, (Pls.' Suppl. to Proposed Findings of Fact and Conclusions of Law); 28 U.S.C.

§ 1605A(c)(1), and as the legal representative of the estate of Soto, a member of the armed forces, 28 U.S.C. § 1605A(c)(4). To obtain relief under § 1605A(c), Plaintiffs must "prove a theory of liability under which defendants cause[d] the requisite injury or death." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 73 (D.D.C. 2010). While § 1605A(c) "provides no guidance on the substantive bases for liability," *Braun*, 228 F. Supp. 3d at 78, courts generally "rely on well-established principles of law, such as those found in Restatement (Second) of Torts, to determine liability under the FSIA," *Abedini v. Government of Islamic Republic of Iran*, 422 F. Supp. 3d 118, 132 (D.D.C. 2019) (internal quotation marks omitted). Here, Plaintiffs seeks to hold Iran liable under theories of battery and intentional infliction of emotional distress ("IIED").[5]

### A.    Battery—Murray

Murray has asserted a battery claim against Iran. Iran is liable for battery if, "when it committed extrajudicial killing or provided material support and resources therefor, it acted 'intending to cause a harmful or offensive contact with . . . , or imminent apprehension of such contact' by, those attacked and . . . 'a harmful contact with' those attacked 'directly or indirectly resulted.'" *Valore*, 700 F. Supp. 2d at 76–77 (quoting Restatement (Second) of Torts § 13). A harmful contact is one that "results in 'any physical impairment of the condition of another's body, or physical pain or illness." *Id.* at 77 (quoting Restatement (Second) of Torts § 15). There is no question that Iran intended to cause harmful contact to Murray and other passengers in the Humvee, as "acts of terrorism are, by their very nature, intended to harm and terrify by instilling fear of such harm." *Id.* And Murray testified that the attack caused him substantial physical pain and traumatic brain injury. The Court therefore concludes that Iran is liable for battery.

---

[5] While the First Amended Complaint purports to assert claims for survival and wrongful death on behalf of Soto's estate, Plaintiffs do not actually request damages with respect to those causes of action. For that reason, the Court does not consider Iran's liability to Soto's estate.

### B.     IIED—Murray

In the First Amended Complaint, Murray also asserts an IIED claim against Iran. "Under general principles of tort law, a defendant is liable for IIED if its 'extreme and outrageous conduct intentionally or recklessly causes severe emotional distress' to a plaintiff." *Barry v. Islamic Republic of Iran*, 410 F. Supp. 3d 161, 177 (D.D.C. 2019) (quoting Restatement (Second) of Torts § 46(1)). Again, the Court readily concludes that Iran's material support for the PDB's extrajudicial killing was an extreme and outrageous act; "[b]y its very definition, an act of terrorism is extreme and outrageous and intended to cause the highest degree of emotional distress." *Id.* (internal quotation marks omitted).

Further, the Court finds that Murray has proven that Iran's conduct did cause him severe emotional distress. Murray testified that after the attack, he began having issues that later resulted in a diagnosis of post-traumatic stress disorder ("PTSD"). (Tr. 115:24–117:22.) In particular, his PTSD has caused certain of his relationships to fall apart and "led to many, many tormenting nights of sleep, lots of nightmares," and at his lowest point, suicidal ideation. (*Id.*) Mundt, the psychological expert who evaluated Murray, opined that Murray suffered from PTSD, unspecified depressive disorder, and moral injury,[6] among other things. (*Id.* at 255:8–256:21.) Further, Mundt concluded that those mental conditions were directly related to the June 16, 2009 attack. (*Id.* at 255:13–21, 278:3–10, 280:18–281:21.) Because there is ample evidence demonstrating the severe emotional distress Murray has suffered as a result of the attack, the Court finds that Iran is liable to Murray for IIED.

---

[6] Mundt testified that "moral injury is not a psychiatric diagnosis" but nonetheless is a "term that is now in widespread use in professional circles where people in mental health and in spiritual professions work with veterans." (Tr. at 278:20–23.) It is used to describe what "happens to war veterans when they return home with feelings of sadness, grief, shame or guilt or remorse related to events of the war zone in which they feel like they failed to act or they acted in a way that hurt somebody." (*Id.* at 278:24–279:7.)

### C.    IIED—Thelma and Jayden

Thelma also asserts IIED claims both on her own behalf and on behalf of her son, Jayden. In FSIA cases, courts have held foreign states liable to plaintiffs against whom the extreme and outrageous conduct was not directed, so long as the plaintiffs prove that: "(1) they are members of a victim's immediate family and (2) they are present at the time [of the extreme and outrageous conduct], or the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person who is not present." *Akins*, 332 F. Supp. 3d at 36 (internal quotation marks omitted). Since Thelma is Soto's wife and Jayden is his son, they meet the immediate family requirement. *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 400 (D.D.C. 2015) ("The 'immediate family' requirement is strictly construed in FSIA cases; generally, only spouses, parents, siblings, and children are entitled to recover."). And while neither was present during the June 16, 2009 attack, family-member plaintiffs "need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result." *Murphy I*, 740 F. Supp. 2d at 76; *see also Cohen*, 238 F. Supp. 3d at 85 ("[B]ecause of the appalling and extreme nature of terrorist attacks, courts in this district have generally held that a defendant is liable to the victim's family even if they were not physically present during the attack as long as there is some evidence that they suffered mental anguish and trauma as a result of it.").

Finally, the Court finds that both Thelma and Jayden suffered severe emotional distress as a result of the attack that killed Soto. Thelma testified to this Court about the severe emotional distress that she experienced upon learning of Soto's death, the difficulties of handling her grief while also raising Jayden, and the sadness she continues to feel today. (Tr. 402:5–406:24.) She also testified about the sadness Jayden feels from never being able to know or have a relationship

with his father. (*Id.* at 407:17–21.) Thus, because Iran's extreme and outrageous conduct caused Thelma and Jayden severe emotional distress, the Court finds that Iran is liable to them for IIED.

## IV.    Damages

Having found Iran liable to Plaintiffs, the Court next considers the proper amount of damages to award each Plaintiff. Damages available under § 1605A(c)'s private right of action "include economic damages, solatium, pain and suffering, and punitive damages." On a motion for default judgment, successful plaintiffs may recover damages if they "prove that the consequences of the foreign state's conduct were reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate." *Roth*, 78 F. Supp. 3d at 402 (internal quotation marks omitted). "In determining the 'reasonable estimate,' courts may look to expert testimony and prior awards for comparable injury." *Akins*, 332 F. Supp. 3d at 39. Here, Murray seeks pain and suffering and punitive damages, and Thelma and Jayden seek solatium damages and punitive damages.[7]

### A.    Pain and Suffering—Murray

Courts determining pain and suffering damages in FSIA default judgment proceedings assess factors such as "the severity of the pain immediately following the injury, the length of the hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Valore*, 700 F. Supp. 2d at 83–84 (internal quotation marks omitted). "In awarding pain and suffering damages, the Court must take pains to ensure that individuals with similar injuries receive similar awards." *Id.* at 84 (internal quotation marks omitted).

---

[7] The Court notes that although certain Plaintiffs have proved multiple theories of Iran's liability, each Plaintiff is entitled to recover under only one of those theories as multiple recovery is prohibited. *Valore*, 700 F. Supp. 2d at 77; *see also Akins*, 332 F. Supp. 3d at 40 ("[I]n view of the bar on multiple recoveries, the plaintiffs may only recover damages reflecting the single harm underlying these three torts.").

By their nature, pain and suffering damages are difficult to quantify. *Aceto v. Islamic Republic of Iran*, No. 19-464 (BAH), 2020 WL 619925, at *18 (D.D.C. Feb. 7, 2020). Many courts awarding pain and suffering damages for surviving victims of terrorist attacks have adopted a "baseline assumption" that "persons suffering injuries in terrorist attacks are entitled to $5 million in damages." *Akins*, 332 F. Supp. 3d at 40 (internal quotation marks omitted). That baseline can be moderated upward "in the presence of severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, including partially lost vision and hearing, or were mistaken for dead." *Id.* (internal quotation marks omitted). Conversely, a downward departure from the baseline assumption has been found appropriate for "relatively more minor injuries, such as minor shrapnel injuries or severe emotional injury accompanied by relatively minor physical injuries." *Barry*, 410 F. Supp. 3d at 180 (internal quotation marks and citation omitted). Courts employing this framework assume that physical injuries are accompanied by severe psychological injuries. *Id.*

One district court adopted a rubric for awarding pain and suffering damages for surviving service members that accounts for their U.S. Department of Veterans Affairs ("VA") disability rating, where available. *See Christie v. Islamic Republic of Iran*, No. 19-1289 (BAH), 2020 WL 3606273, at *23 (D.D.C. July 2, 2020); *Aceto*, 2020 WL 619925, at *18; *Schooley v. Islamic Republic of Iran*, No. 17-1376 (BAH), 2019 WL 2717888, at *74 (D.D.C. June 27, 2019). "The VA disability rating constitutes a specialized agency's official determination regarding the extent of disabling injury sustained by service members in connection with military service." *Id.* (internal quotation marks omitted). Thus, the VA disability rating provides "an objective metric" that also has the virtue of treating "mental and physical injuries as equally capable of causing

disability, and therefore equally deserving of compensatory damages." *Id.* Accordingly, by including "both mental and physical injuries in a single number," consideration of the VA disability rating "facilitates an approach to awarding damages that is generally agnostic to the mental or physical nature of the injury." *Id.* Under the VA disability rating rubric:

> [T]hose service member plaintiffs rated by the VA up to 30% disabled, whether due to mental or physical injuries, or a combination of both, will receive a baseline award of $5,000,000 each; those plaintiffs rated 40–60% disabled by the VA will receive an upward departure, for a total award of $6,000,000 each; and those service member plaintiffs rated 70–100% disabled by the VA will receive a further upward departure, for a total of $7,000,000 each.

*Schooley*, 2019 WL 2717888, at *75. Here, Murray has received a VA disability rating of 100%, (Tr. at 113:23–114:2.) Thus, he urges this Court to employ the rubric to give him a baseline award of $7,000,000 and then further depart upward for total pain and suffering damages of $9,000,000.

Before determining the proper amount of pain and suffering damages to award Murray, the Court first elaborates on Murray's injuries attributable to the June 16, 2009 attack. At the time of the attack, Murray was a physically fit 25-year-old man with few notable health problems. (Tr. 88:15–16; Mundt Expert Report at 4–5, Dkt. No. 74.) Indeed, in high school, Murray was an accomplished athlete and was recruited to play football by multiple prominent Division I colleges. (Tr. at 89:14–25.) Murray opted to attend West Point, where he played football and participated in track and field. (*Id.* at 92:20–93:4.) As a result of the attack, Murray now suffers from severe back pain, the effects of traumatic brain injury, PTSD, depression, and other cognitive impairments. (Tr. at 113:17–20; Mundt Expert Report at 9.) The psychological expert, Mundt, opined that Murray will have to deal with his PTSD and cognitive issues for the rest of his life. (Tr. at 283:19–22.)

Murray testified that his physical and mental issues continue to affect his life negatively. He explained that he no longer knows "what life is like without back pain." (*Id.* at 117:23–118:4.)

On his best days, Murray's pain rates as a 3 out of 10 but some days he deals with pain at a 7. (*Id.*) Moreover, Murray has lingering memory problems secondary to the attack. (*Id.* at 275:14–276:8.) Shortly after his return from deployment, Murray took a neurological examination and scored a 7 out of 85 for short-term memory. (*Id.* at 110:17–23.) Since then, he has learned to cope with his memory problems, but it took extremely hard work for him to do so. (*Id.* at 119:22–120:4.) Murray has also struggled with debilitating migraines, which stem from the traumatic brain injury he suffered from the attack. (*Id.* at 120:5–17; 275:12–17.)

In 2013, Murray was medically retired from the Army after receiving a 100% VA disability rating. (*Id.* at 113:14–114:2.) Following his discharge, Murray worked at USAA, a financial services company serving military members and their families. (*Id.* at 114:13–17.) While at USAA, he frequently had to take days off due to his back pain and migraines. (Mundt Expert Report at 14.) Being a veteran-friendly employer, the USAA was accommodating of Murray's physical and mental health issues. (*Id.*) Nonetheless, Murray's back pain precluded him from commuting to his job at the USAA and ultimately caused him to leave the position (he made that decision before the COVID-19 pandemic made work-from-home arrangements more widely available). (Tr. at 120:18–121:10.) At the time of his testimony, Murray was working from home for a friend's start-up business. (*Id.* at 121:11–122:1.) He described his work aspirations as limited by what he is capable of doing in light of his disabilities—as he explained to Mundt, "coping with pain and mobility limitations is effectively a part-time job for him." (Tr. at 121:5–10; Mundt Expert Report at 15.) Similarly, Murray pursued post-graduate education and, while successful, his cognitive issues necessitated that he enroll in a specific program and be afforded numerous reasonable accommodations. (Tr. at 114:20–115:23.) In addition, Murray expressed distress over how his back pain negatively impacts his relationship with his two sons. (*Id.* at 118:25–119:12.)

Based on the uncontroverted evidence before it, the Court finds that an award of $7 million in pain and suffering damages to Murray is appropriate. The Court would arrive at this damages award regardless of whether it employed Murray's preferred VA-disability-rating rubric or the approach centered around a $5 million baseline. Under the VA-disability-rating rubric, the damages calculation is straightforward: Having been given a 100% VA disability rating, Murray is entitled to a $7 million pain and suffering damages award. Murray argues that the Court should further depart upward due to the gruesome and targeted nature of the attack and his continuing physical, cognitive, and emotional injuries, but the Court declines to do so. This Court observes that the district court that has employed this rubric has not issued more than $7 million pain and suffering damages to any plaintiff with a VA disability rating greater than 70%. *See Christie*, 2020 WL 3606273, at *24; *Aceto*, 2020 WL 619925, at *19; *Schooley*, 2019 WL 2717888, at *75. Each of those cases involved claimants who were injured in a terrorist car bombing of a residential complex involving "the largest non-nuclear explosion ever up to that time." *Schooley*, 2019 WL 2717888, at *3. Many claimants receiving $7 million damages awards had very similar injuries as Murray. For example, one claimant sustained traumatic brain injury that caused chronic and debilitating headaches, PTSD, and ongoing arm pain. *Christie*, 2020 WL 3606273, at *4. Another claimant was rated 100% disabled due to back and neck trauma, chronic headaches, memory loss from traumatic brain injury, PTSD, and neurologic and orthopedic conditions. *Schooley*, 2019 WL 2717888, at *32. Nothing about Murray's circumstances warrants awarding him greater pain and suffering damages than the comparable victims of the bombing underlying *Christie*, *Aceto*, and *Schooley*.

Alternatively, if the Court were to begin with a $5 million baseline, it would depart upward to $7 million due to the severity and chronic nature of Murray's injuries. Indeed, courts

have expressly approved damages awards of $7–12 million for more severe physical and psychological injuries. *Barry*, 410 F. Supp. 3d at 180. An upward departure is warranted based on the fact that the attack has caused substantial physical limitations to Murray, a former elite athlete, and caused him psychological trauma and cognitive impairments that are likely to last a lifetime. However, the Court does not believe that a departure all the way to $9 million is warranted given that Murray remains able to walk, work (at least subject to reasonable accommodations), and care for himself. Murray's injuries are similar to those of the plaintiff in *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 49, 57 (D.D.C. 2009), to whom that district court awarded $7 million pain and suffering damages after balancing the plaintiff's PTSD, constant back pain, migraine headaches, and depression against the fact that he was married with two children and had a career as a teacher.

There is, of course, no perfect way to measure the pain and suffering of a victim of a brutal terrorist attack. Nonetheless, the Court has considered two different approaches employed by district courts in the FSIA default judgment context, and both approaches converge on the same $7 million figure. Considering the totality of the evidence before it, the Court finds $7 million to be a reasonable and appropriate award. Consequently, the Court concludes that Murray will be awarded $7 million in damages for his pain and suffering as a survivor of the June 16, 2009 attack.

### B. Solatium—Thelma and Jayden

Thelma and Jayden seek solatium damages to compensate them for the emotional distress they experienced as Soto's surviving widow and son. In the FSIA context, damages sought in connection with surviving family members' IIED claims are discussed as claims for solatium damages. *Blank v. Islamic Republic of Iran*, No. 19-3645 (BAH), 2021 WL 3021450, at *11

(D.D.C. July 17, 2021). "Solatium is awarded to compensate the mental anguish, bereavement, and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent's society and comfort." *Valore*, 700 F. Supp. 2d at 85 (internal quotation marks omitted). "Courts may presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish." *Roth*, 78 F. Supp. 3d at 403.

Generally, courts employ the standardized framework first set forth in *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006), as an appropriate measure of damages for surviving family members of victims who have died in a terrorist attack. *E.g.*, *Roth*, 78 F. Supp. 3d at 403; *Valore*, 700 F. Supp. 2d at 85. "As a baseline, the *Heiser* framework awards spouses of deceased victims approximately $8 million, while . . . children received $5 million." *Akins*, 332 F. Supp. 3d at 43 (internal quotation marks omitted). Of course, *Heiser* provides only a baseline and the Court may deviate upward or downward to account for specific circumstances. *Id.* Factors militating in favor of an enhancement of a solatium award include:

> evidence establishing an especially close relationship between the plaintiff and the decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing.

*Id.* (internal quotation marks omitted). "Decisions to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case." *Braun*, 228 F. Supp. 3d at 85 (internal quotation marks omitted).

At the evidentiary hearing, Thelma recounted how she and Soto first met using the early social media site Myspace. (Tr. 369:9–24.) At the time, Soto was deployed in Iraq. (*Id.* at 370:17–371:9.) During a two-week vacation from his deployment, Soto and Thelma were able to meet in

person. (*Id.* at 372:13–371:2.) When they met, Thelma said it was "love at first sight." (*Id.* at 373:13–18.) Before returning to Iraq, Soto asked Thelma's father for permission to propose to Thelma, which he received. (*Id.* at 376:14–17.) Soto could not wait until he finished his deployment to propose to Thelma in person. (*Id.* at 376:18–377:12.) Thus, while still in Iraq, Soto mailed Thelma a Denver Broncos jersey, her favorite NFL team, with "Ms. Soto" printed on the back. (*Id.*) Over the phone, a confused Thelma asked why it said "Ms. Soto" on the back, to which Soto asked whether she wanted to be "Ms. Soto" and proposed. (*Id.*)

Once Soto was back from his deployment, Thelma moved to live with Soto in Texas, where he was stationed at Fort Hood. (*Id.* at 380:6–18.) In January 2008, Thelma learned that she was pregnant. (*Id.* at 384:2–385:11.) Thelma described Soto as "over the moon about the news," as it fulfilled his dream of having a family. (*Id.*) The couple married in May 2008 and Jayden was born four months later, on September 2, 2008. (*Id.* at 387:1–23.) Soto did not get to spend a long time with Jayden after his birth, due to his Army obligations, but even in the short time they had together, "Jayden was [Soto's] world." (*Id.* at 392:5–394:11.) Thelma described Soto as a devoted and "very proud dad." (*Id.* at 394:6–11.) In May 2009, Soto was again deployed to Iraq. (*Id.* at 396:14–397:16.) The last time Soto saw Thelma and Jayden was at the airport; he told Thelma to "stay strong while I'm gone. I married you because you're strong, and you're a good mother. I'm very lucky to have you." (*Id.*)

Thelma learned that Jayden had died from her brother-in-law, who was also in the military. (*Id.* at 400:11–22.) All she could remember is collapsing on the floor upon receiving the news. (*Id.*) Later that day, Thelma received official word when two men in uniform came to her door. (*Id.* at 402:7–403:15.) Thelma recalled bringing Jayden to Soto's open-casket memorial service. At that point, Jayden was old enough to recognize his father. (*Id.* at 404:21–405:8.) When

Jayden saw his father in the casket, he got happy and exclaimed "Dadda's here," reaching out to Soto, too young to understand that Soto would not be able to hold him. (*Id.*) The ensuing months and years were difficult for Thelma. (*Id.* at 406:3–11.) Particularly challenging was grieving Soto's death while raising an infant. (*Id.* at 406:12–24.) Thelma described herself as lost and figuring out everything out on her own. (*Id.*) As Jayden got older, Thelma did her best to tell Jayden about his father and what happened to him in an age-appropriate manner. (*Id.* at 406:25– 407:21.) She testified about an area of her home dedicated to Soto where Jayden would sometimes go "to . . . play with Daddy." (*Id.*) Thelma did eventually remarry, and today she lives with her husband and Jayden, who is now 12 years old. (*Id.* at 366:7–13.) She explained her mission in life is to make Soto proud by being the strong, wonderful mom he told her she was at the airport before leaving for Iraq. (*Id.* at 409:1–6.)

Applying the *Heiser* framework, the Court finds that Thelma and Jayden have amply demonstrated their entitlement to the baseline solatium awards—$8 million for Thelma and $5 million for Jayden. However, Thelma and Jayden seek an upward departure to $12 million and $8 million, respectively, due to aggravating circumstances. In particular, they cite the fact that Soto suffered excruciating pain before his death, was killed only one year into his marriage, and left behind a nine-month-old son who he barely got to know. Although the Court fully recognizes the horrific and tragic circumstances of Soto's death and the tremendous grief and hardship Thelma and Jayden have experienced from his passing, it cannot conclude that the circumstances here warrant the substantial enhancement that they seek.

As a general matter, departures from the *Heiser* baselines are "usually relatively small, absent circumstances that appreciably worsen a claimant's pain and suffering, such as cases involving torture or kidnapping of the party to whom extreme and outrageous conduct was

directed." *Murphy I*, 740 F. Supp. 2d at 79 (internal quotation marks omitted). Moreover, while a

person will understandably experience profound anguish from losing a family member to a

terrorist attack, courts have found that a plaintiff's suffering must be "particularly devastating and

uniquely acute" to warrant an upward departure, such as "nervous breakdowns or self-destructive

behavior." *Id.* Admirably, Thelma was able to endure her tragic loss relatively well; she explained

how baby Jayden's resemblance to Soto motivated her to go on and focus on being the best

possible mother to Jayden. (Tr. 406:12–24.) And despite the sadness Jayden feels from not being

able to know his father, Thelma describes Jayden as, kind, respectful, and "so mature for his

age"—she says she "couldn't ask for a better son." (*Id.* at 408:18–22.)

In sum, the Court finds that the *Heiser* framework provides appropriate solatium awards

for Thelma and Jayden and the evidence does not support a further upward departure.

Accordingly, the Court awards Thelma $8 million in solatium damages and it awards Jayden $5

million.

## V.     Punitive Damages

Finally, all Plaintiffs request that the Court assess punitive damages against Iran. "Punitive

damages are explicitly made available under section 1605A's cause of action for the purpose of

punishing and deterring foreign states from engaging in or materially supporting terrorism." *Roth*,

78 F. Supp. 3d at 403. Thus, punitive damages "are awarded not to compensate the victims, but to

punish outrageous behavior and deter such outrageous conduct in the future." *Braun*, 228 F. Supp.

3d at 86 (internal quotation marks omitted). Courts evaluate four factors in determining a proper

punitive damage award: "(1) the character of the defendants' act, (2) the nature and extent of harm

to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and

(4) the wealth of the defendants." *Valore*, 700 F. Supp. 2d at 87 (internal quotation marks omitted).

There are several approaches taken by courts assessing punitive damages in the FSIA default judgment context. For a while, district courts would multiply Iran's annual expenditures for terrorist activities by a factor of between 3 and 5 to arrive at a punitive damages award, finding that the method was calibrated to produce an award that was proportional to a defendant's acts and large enough to have a deterrent effect on the foreign state. *See, e.g.*, *Roth*, 78 F. Supp. 3d at 403–04; *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 34 (D.D.C. 1998). That method has fallen out of favor, as it was "established and used when the prevailing estimate of Iran's terrorism spending was between \$75–200 million," yielding punitive awards in the \$300 million range. *Abedini*, 422 F. Supp. 3d at 141. Considering more recent estimates that Iran spends close to \$1 billion a year on terrorism, using that figure as the lodestar would yield excessive punitive damages awards. *Id.* Some district courts simply adopt a flat rate of \$150 million punitive damages per affected family. *See, e.g.*, *Colvin v. Syrian Arab Republic*, 363 F. Supp. 3d 141, 163–64 (D.D.C. 2019); *Braun*, 228 F. Supp. 3d at 87. The rationale for employing this method is to ensure that the punitive damages award is "reasonably predictable in its severity so that a bad man can look ahead with some ability to know what the stakes are in choosing one course of action or another." *Abedini*, 422 F. Supp. 3d at 142 (quoting *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 502 (2008)). But this approach has been criticized as "limit[ing] a judge's discretion to tailor a punitive award appropriate to the magnitude of the underlying injury." *Id.*

Plaintiffs do not contend that this Court should use the method centered around Iran's annual terrorist-activity expenditures, nor do they provide this Court with evidence concerning the most recent figures concerning Iran's expenditures. And the Court agrees with the other district

courts that have found that method to be outdated and to yield excessive punitive damages awards. The Court also declines to adopt the flat-rate method. As discussed above, the Court is to tailor the punitive damages award to the circumstances of the case and a flat-rate method improperly limits the Court's ability to do so.

More recently, many district courts have simply taken the approach of awarding punitive damages equal to compensatory damages. *See, e.g.*, *Abedini*, 422 F. Supp. 3d at 141–42; *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 167 (D.D.C. 2017). Some district courts will go further and apply a multiplier to the compensatory damages award. *See, e.g.*, *Gill*, 249 F. Supp. 3d at 105–06. Usually, those courts find that "special circumstances" justify application of a multiplier. *Saberi v. Gov. of Islamic Republic of Iran*, No. 19-cv-1081 (DLF), 2021 WL 2117164, at *13 (D.D.C. May 25, 2021). Plaintiffs request that this Court use an approach centered around applying a multiplier to their compensatory damages awards.

The Court agrees that it is appropriate to use Plaintiffs' compensatory damages awards as a lodestar, since such that approach best accounts for the character of Iran's acts and the magnitude of the harm caused. Thus, the Court must determine whether to apply a multiplier, as Plaintiffs request. The Court notes that several district courts have rejected the multiplier approach as yielding an excessive award. *E.g.*, *Selig v. Islamic Republic of Iran*, No. 1:19-cv-02889-TNM, 2021 WL 5446870, at *24 (D.D.C. Nov. 22, 2021); *Christie*, 2020 WL 3606273, at *28–29. Those courts question the justification for large punitive damages awards given "the lack of any evidence that high awards have successfully deterred Iran," and express concern that because "the prospects for recovery upon judgments entered in these cases are extremely remote," large punitive damages awards "may serve only to expose the political branches to an

36

unprecedented burden in their management of United States foreign policy towards Iran." *Christie*, 2020 WL 3606273, at *29 (internal quotation marks omitted).

Other courts, however, have recognized that "[o]nly a large amount of punitive damages can serve as an effective deterrent against future terrorist acts." *Colvin*, 363 F. Supp. 3d at 163 (internal quotation marks omitted). Moreover, the Court believes that its award should account for the fact that the present case may be the first action arising from the June 16, 2009 attack. Some district courts have deemed it appropriate to award substantial punitive damages under the flat-rate method where similar conduct has not previously been litigated. *See, e.g.*, *Colvin*, 363 F. Supp. 3d at 163–65 (awarding $300 million to decedents of journalist murdered while covering the Syrian civil war); *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 60 (D.D.C. 2018) (awarding $150 million to each of the three plaintiffs for the torture, hostage taking, and extrajudicial killing of student visiting North Korea as a tourist). By contrast, district courts are wary of imposing high punitive damages awards when punitive damages have already been awarded by another district court with respect to the same attack. *See, e.g.*, *Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 251–52 (D.D.C. 2020). Finally, the Court notes that some district courts have found the fact that an attack caused even a single death warrants a substantial punitive damages award. *W.A. v. Islamic Republic of Iran*, No. 18-cv-1883(CKK/GMH), 2020 WL 7869218, at *20 (awarding $150 million lump sum to estate and surviving family members of victim who was kidnapped, tortured, and murdered by an organization to which Iran provided material support and resources), *report and recommendation adopted by*, 18-1883 (CKK), 2020 WL 7869211 (D.D.C. Apr. 11, 2020); *Braun*, 228 F. Supp. 3d at 87 (awarding $150 million to estate and surviving family members of infant who was killed after being struck by a car driven

intentionally into a crowd by an operative of Hamas, an organization receiving material support and resources from Iran).

Considering the varying awards issued in FSIA cases, the Court believes that simply awarding punitive damages equal to compensatory damages would be insufficient to punish Iran for its involvement in the June 16, 2009 attack. Instead, applying a multiplier of 3 to compensatory damages results in a more appropriate award. Indeed, the multiplier-of-three approach to punitive damages is becoming the usual practice in state-sponsored terrorism cases. *See Fuld v. The Islamic Republic of Iran*, No. 20-cv-03492-RCL, 2024 WL 1328790, at *19 (D.D.C. March 28, 2024); *Roth v. Syrian Arab Republic*, No. 1:14-cv-01946-RCL, 2018 WL 4680270, at *17 (D.D.C. Sept. 28, 2018). The multiplier will be applied to each Plaintiff's compensatory damages award. *E.g.*, *Selig*, 2021 WL 5446870, at *25 (apportioning punitive damages among the plaintiffs according to their compensatory damages). Thus, Murray will receive punitive damages of $21 million, Thelma will receive $24 million, and Jayden will receive $15 million.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for entry of default judgment is granted. Murray is awarded $7 million for pain and suffering and $21 million in punitive damages, Thelma Soto, individually, is awarded solatium damages of $8 million and punitive damages of $24 million, and Thelma Soto, in her capacity as next friend of Jayden Soto, is awarded $5 million solatium damages and $15 million punitive damages. The Clerk is directed to enter Judgment consistent with this order.

ENTERED:

Dated: March 31, 2024

Andrea R. Wood
United States District Judge